UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NATIONAL FEDERATION OF THE BLIND, on behalf of
their members and themselves,
MARK CADIGAN,
MIKA PYYHKALA,
LISA IRVING,
ARTHUR JACOBS,
JEANINE KAY LINEBACK, and
HEATHER ALBRIGHT, on behalf of themselves
and all others similarly situated,

        Plaintiffs,

                                Civil Action No. 15-12984-NMG

v.

THE CONTAINER STORE, INC.,

        Defendant.

REPORT AND RECOMMENDATION ON
DEFENDANT'S MOTION TO ENFORCE ARBITRATION AND CLASS ACTION
WAIVERS AND STAY ACTION (#42).

KELLEY, U.S.M.J.

This is a putative class action alleging discrimination in violation of the Americans with

Disabilities Act, 42 U.S.C. § 12101 *et seq* (the "ADA") and the discrimination laws of

Massachusetts, New York, Texas, and California.  Specifically, Plaintiffs allege that blind

individuals who shop at Defendant The Container Store's locations across the country should

have equal access to Defendant's payment methods and loyalty programs.  Defendant has moved

to compel arbitration and to stay the litigation, contending that Plaintiffs enrolled in Defendant's

loyalty program, which requires that disputes be submitted to arbitration.[1]  For the reasons set

forth below, I do not agree that this matter is subject to arbitration.  Accordingly, I recommend

that Defendant's Motion to Enforce Arbitration and Class Waivers and Stay Action be DENIED.

I.    BACKGROUND

The National Federation of the Blind ("NFB")[2] and six legally blind individuals residing

in the states of Massachusetts, New York, Texas, and California filed this lawsuit alleging that

Defendant violated and continues to violate the ADA and discrimination laws of the

aforementioned states.  (#17.)  Plaintiffs' core allegation is that Defendant's point-of-sale

("POS") devices and kiosks are not accessible to blind individuals.[3]  (#17 ¶ 3.)  Defendant

maintains POS devices that use a visual, touch-screen interface, rather than tactually discernable

keypad surfaces.  *Id.*  Unlike Defendant's touch-screen devices, POS devices with tactually

discernible keypads are independently usable by a visually impaired person.  (#17 ¶ 39.)  As a

result, Plaintiffs allege that Defendant prevents blind customers from independently entering a

personal identification number ("PIN") to make a debit card purchase or credit card transaction

that requires a PIN.  (#17 ¶¶ 2-3.)

---

[1] Defendant has not moved to compel arbitration of the claims of Plaintiffs Cadigan and Albright, presumably because neither is a member of the loyalty program at issue.  (*See* #55, Ex. E.)  At oral argument, the parties disagreed as to whether The National Federation of the Blind's claims are subject to mandatory arbitration.  Given this Court's ultimate resolution, however, the issue need not be decided.  Thus, for purposes of this Report and Recommendation the term "Plaintiffs" refers to The National Federation of the Blind, Mika Pyyhkala, Lisa Irving, Arthur Jacobs, and Jeanine Kay Lineback.

[2] NFB is the largest organization of blind and low vision people in the United States. (#17 ¶ 19.)  NFB's purpose "is two-fold – to help blind persons achieve self-confidence and self-respect, and to act as a vehicle for collective self expression by the blind."  *Id.*  NFB provides advocacy services for the protection of the civil rights of blind persons in furtherance of its mission.  *Id.*

[3] The parties do not dispute that Defendant's stores qualify as places of public accommodation under the ADA, and therefore Defendant has an obligation to provide equivalent access to its goods and services to persons with disabilities.  42 U.S.C. § 12181(7)(E).

Plaintiffs further allege that Defendant does not provide equal access for blind customers to the benefits of Defendant's loyalty program, POP! – Perfectly Organized Perks (the "Loyalty Program"). (#17 ¶ 7.) The Loyalty Program provides various advantages to customers, including special discounts and rewards, and the ability to return any product for a full refund without a receipt. *Id.* To enroll in the Loyalty Program and to continue to receive its benefits, a customer must provide her personal email address or telephone number. *Id.* ¶ 8. Additionally, shoppers must register each purchase through the Loyalty Program. *Id.* Because blind customers cannot visually read the POS devices, they cannot independently enter their email address or telephone number to register their purchases, and therefore they must verbally disclose their personal information in connection with each purchase. *Id.* Without the ability independently to enter their personal information, Plaintiffs bear privacy and security risks that sighted customers do not. *Id.* ¶ 2.

The Loyalty Program's terms and conditions contain a mandatory arbitration and class action waiver provision, which provides:

> You agree that The Container Store and you will resolve any disputes through binding and final arbitration instead of through court proceedings. YOU HEREBY WAIVE ANY RIGHT TO A JURY TRIAL OF ANY DISPUTE YOU HAVE WITH THE CONTAINER STORE. NEITHER YOU NOR THE CONTAINER STORE MAY BRING A CLAIM AGAINST THE OTHER AS A CLASS ACTION, REPRESENTATIVE ACTION, OR PRIVATE ATTORNEY GENERAL ACTION. NEITHER YOU NOR THE CONTAINER STORE MAY ACT AS A PRIVATE ATTORNEY GENERAL OR CLASS REPRESENTATIVE, NOR PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS WITH RESPECT TO ANY DISPUTE OR CLAIM BETWEEN US. These POP! Program terms evidence a transaction in interstate commerce, and thus the arbitration will be subject to the Federal Arbitration Act . . .

> In the event of any dispute concerning the POP! Program or these terms, the parties unconditionally and irrevocably agree the dispute will be resolved by arbitration . . . exclusively in Dallas, Texas, in accordance with the rules of the American Arbitration Association. The arbitration will be heard and determined

3

by a single arbitrator. The arbitrator's decision will be final and binding upon the parties and may be enforced in any court of competent jurisdiction. The prevailing party will be entitled to recover its attorneys' fees and arbitration costs from the other party. . . .

(#42-2 at 4-5.)  Defendant contends that as a condition of enrollment in the Loyalty Program, customers must agree to the Loyalty Program's terms and conditions.  (#42-1 ¶ 2.)  To enroll at one of Defendant's stores, an individual must press a box on the POS device that reads "I ACCEPT" and displays the Loyalty Program's terms and conditions.  *Id.*  When enrolling online, the user must check a box that reads "□ I agree to the <u>POP! terms and conditions</u>" and contains a link to the terms and conditions.  *Id.*  According to Defendant, the enrollment process cannot be completed without consent to the terms and conditions.  *Id.*

 Defendant maintains that Plaintiff Pyykhala enrolled in the Loyalty Program on a POS device at the register in one of Defendant's stores by providing an email address on December 14, 2014; Plaintiffs Jacobs and Irving enrolled in a similar manner on May 7, 2015 and May 18, 2015, respectively.  *Id.* ¶¶ 3-5.  According to Defendant, a cashier or customer representative was available to read the terms and conditions of enrollment.  *Id.* ¶¶ 3-5.  Defendant also sent an email to Plaintiffs Pyykhala, Irving, and Jacobs at the time of enrollment which contained a link to the terms and conditions.  *Id.* ¶¶ 3-5.  In accordance with company practice, several promotional emails are sent each month to members of the Loyalty Program, including Pyykhala, Irving, and Jacobs, and each email contains a link to the terms and conditions.  *Id.* ¶¶ 3-5.

Plaintiffs Pyykhala, Irving, and Jacobs (collectively, the "In-Store Plaintiffs") claim that they were unable independently to use the POS devices at their local stores and were forced verbally to disclose their personal information to the store clerk in order to enroll in the Loyalty

4

Program.  *Id.* ¶¶ 69, 71, 73.  They further contend that they were never presented with the Loyalty Program's arbitration provision in an accessible manner, nor were they even aware of the existence of the arbitration provision.  (#55, Exs. A, B, C.)

According to Defendant, Plaintiff Lineback enrolled in the Loyalty Program online by providing an email address on May 28, 2015. (#42-1 ¶ 6.)  As a condition of enrollment, Lineback had to agree to the Loyalty Program's terms and conditions by checking a box that contained a link to the terms and conditions.  *Id.*  As with the other individual plaintiffs, Defendant asserts that Lineback could not have completed the enrollment process without agreeing to the terms and conditions, and that an email was sent to Lineback at the time of enrollment, which contains a link to the terms and conditions.  *Id.*  Defendant also contends that Lineback receives several promotional emails per month, and each email contains a link to the terms and conditions.  *Id.* ¶ 6.   Plaintiff Lineback, however, has previously stated that she was not presented with any terms and conditions that were accessible to her when she enrolled online and did not agree to any arbitration provision.  (#55, Ex. E.)   Interestingly, Lineback originally attempted to enroll at her local store but was unable to do so because she could not use the POS device. (#17 ¶ 75.)

Defendant has moved to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*; (the "FAA"),[4] seeking an order compelling Plaintiffs to submit their claims to arbitration and to waive their right to assert class representative claims, and requesting a stay. (#42 at 1.)  The parties fully briefed the issues and this Court heard oral argument.  As indicated above at note 1, because Defendant has not moved to compel arbitration of the claims of

---

[4] The parties do not dispute that their relationship involves interstate commerce and is therefore governed by the FAA.

plaintiffs Cadigan and Albright, this Report and Recommendation addresses Defendant's motion only with respect to Plaintiffs NFB, Pyykhala, Irving, Jacobs, and Lineback.

II.    STANDARD OF REVIEW

A party seeking to compel arbitration "must demonstrate that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope." *Soto–Fonalledas v. Ritz–Carlton San Juan Hotel Spa & Casino,* 640 F.3d 471, 474 (1st Cir. 2011) (internal quotation marks omitted).  Under the FAA, a written provision in a contract "to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contracts."  9 U.S.C. § 2.  As the United States Supreme Court has stated, "the FAA was designed to promote arbitration, and . . . embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts." *AT&T Mobility LLC v. Concepcion,* 563 U.S. 333, 345 (2011); *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 443 (2006).

Although the federal policy in favor of arbitration is strong, "[e]ven strong policies . . . have boundaries. A court may order parties to arbitrate a given dispute only if they have agreed to submit such a dispute to arbitration." *Escobar-Noble v. Luxury Hotels Int'l of Puerto Rico, Inc.*, 680 F.3d 118, 121-22 (1st Cir. 2012) (internal citations omitted).  Therefore, "a court should not compel arbitration unless and until it determines that the parties entered into a validly formed and legally enforceable agreement covering the underlying claim(s)." *Id.* (internal citation omitted).  "To satisfy itself that such agreement exists, the court must resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to

have the court enforce." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010).

Whether an agreement to arbitrate exists is a question of state contract law. *Rosenberg v. Merrill*

*Lynch, Pierce, Fenner & Smith, Inc.,* 170 F.3d 1, 19 (1st Cir. 1999).

III.   DISCUSSION

Defendant asserts that Plaintiffs' claims are subject to the mandatory arbitration provision

set forth in the Loyalty Program's terms and conditions.   Specifically, Defendant alleges that

Plaintiffs consented to the arbitration provision when they enrolled in Defendant's Loyalty

Program.   It is undisputed that Plaintiffs enrolled in the Loyalty Program.   However, Plaintiffs

argue that, for several reasons, no enforceable agreement to arbitrate exists.

A.   Arbitration of Plaintiffs' ADA Claims

When a party relies on the FAA to compel arbitration of a claim arising under the ADA,

the court "must undertake a supplemental inquiry." *Campbell v. Gen. Dynamics Gov't Sys.*

*Corp.,* 407 F.3d 546, 552 (1st Cir. 2005).   The ADA provides that "[w]here *appropriate* and to

the extent authorized by law, the use of alternative means of dispute resolution, including . . .

arbitration, is encouraged to resolve disputes arising under this Act."   42 U.S.C. § 12212

(emphasis added).   Therefore, a party may prevail on its demand for arbitration [of an ADA

claim] if it can establish:   (1) that the provision for mandatory arbitration is part of a valid

contract within the purview of the FAA; and (2) enforcement of the arbitration provision would

be appropriate. *Campbell*, 407 F.3d 554-55; *see also Rosenberg*, 170 F.3d at 18-19.   Here, "the

burden is on the party resisting arbitration to show . . . that Congress, in enacting a particular

statute, intended to preclude a waiver of a judicial forum for certain statutory claims." *Campbell*,

407 F.3d at 552.

As a threshold matter, assuming *arguendo* that the agreement to arbitrate is valid, subjecting Plaintiffs' ADA claims to arbitration would be inappropriate under the circumstances here.  In *Campbell*, the First Circuit determined that the arbitration of an ADA claim is appropriate only when the communication of the agreement afforded minimally sufficient notice of waiver of the right to proceed in a judicial forum.  407 F.3d 554-55.  The court considered whether, under the totality of the circumstances, the communication would have provided a reasonably prudent party waiver of such waiver.  *Id*.  This is an objective standard and the analysis is performed on a case-by-case basis.  *Id.* at 555.  The factors to consider include the method of communication, the context and the content of the communication.  *Id.*

Applying this framework to the present case, Plaintiffs were not afforded the "minimal level of notice" sufficient to apprise them that they were agreeing to the Loyalty Program's terms and conditions and so had waived their rights to pursue their ADA claims in court.  *See Campbell*, 407 F.3d at 554.   To begin, the method of in-store communication—an inaccessible POS device—rendered the communication meaningless.  More specifically, on the evidence presented, it appears the In-Store Plaintiffs had no notice of the existence of the Loyalty Program's terms and conditions, let alone that their enrollment would effect a waiver of their rights to litigate an alleged violation of the ADA.

The context of the communication is significant as well.  *Campbell*, 407 F.3d at 555.  The Plaintiffs have shown that the manner in which the Loyalty Program's terms and conditions were presented did not signal that they were at risk of "replacing court access with arbitration."  *Id.* Indeed, it seems Plaintiffs believed they were merely agreeing to enroll in a customer benefits and perks program.  While Defendant states that customer representatives were available to read the Loyalty Program's terms and conditions, Defendant has not demonstrated that in fact its

employees alerted the In-Store Plaintiffs to the existence of the Loyalty Program's terms and

conditions.  It is quite plausible that Defendant "disguised the import of the communication," by

not providing the communication in an accessible manner.  *Id.* at 557.

Further, Plaintiffs understood the Loyalty Program to provide customer perks and

benefits.  Nowhere does the Loyalty Program itself signal that by agreeing to its terms, a

customer agrees to arbitrate statutory discrimination claims.   In that same vein, the Loyalty

Program's arbitration provision broadly covers all claims between Defendant and customer but

does not expressly enumerate claims of discrimination.  *See Soto-Fonalledas*, 640 F.3d at 478

(arbitration appropriate where governing provision expressly covered claims of discrimination

based on protected status).   Given the nature and context of the agreement here—a customer

loyalty program—such broad language does not provide adequate notice that Plaintiffs were

"'agreeing to arbitrate statutory discrimination claims.'"  *Salvi v. TRW Automotive U.S. LLC*, No.

11-40085, 2012 WL 274755, at *4 (D. Mass. Jan. 30, 2012) (quoting *Soto-Fonalledas*, 640 F.3d

at 478).   Accordingly, compelling arbitration of Plaintiffs' ADA claims would be inappropriate.

This Court finds no reason to differentiate between the In-Store Plaintiffs and Plaintiff

Lineback for the purposes of whether arbitration of Plaintiffs' ADA claims is appropriate under

the circumstances.[5]  Plaintiff Lineback does not deny that she enrolled in the Loyalty Program

using her home computer.  (#55, Ex. D.)  However, like the In-Store Plaintffs, it would be

inappropriate here to compel Lineback's ADA claims to arbitration,[6] because the Loyalty

---

[5] As discussed *infra*, this Court believes a distinction exists between the In-Store Plaintiffs and Plaintiff
Lineback with respect to the questions of whether an agreement was formed and whether such an
agreement is unconscionable.

[6] Indeed, Plaintiffs' complaint alleges that Lineback was unable to register for the Loyalty Program at her
local store because she was unable to use the POS device.  (#17 ¶ 75.)  It would not be unreasonable to

Program's terms and conditions themselves fail to convey a waiver of her right to pursue statutory discrimination claims in a judicial forum.

More fundamentally, discrimination laws, such as the ADA, "reflect a Congressional finding that certain groups are especially in need of federal protection . . . [and access to courts] continues to play a critical role[] in the legal and social changes that strike at the core of the purpose of discrimination laws." *Campbell v. General Dynamics Gov't Systems Corp.*, 321 F. Supp.2d 142, 148 (D. Mass. 2004), *aff'd*, 407 F.3d 546 (2005) (internal citations omitted). Thus, under the framework set forth in *Campbell*, this Court finds it would not be appropriate to arbitrate Plaintiffs' ADA claims.

B.  Plaintiffs' Claims Under State Law Contract Principles

Because the First Circuit expressly limited its holding in *Campbell* to ADA claims, the inquiry as to Plaintiffs' claims does not end there. *Awuah v. Coverall North America, Inc.*, 703 F.3d 36, 45 (1st Cir. 2012) (recognizing *Campbell* holding limited to ADA claims). Setting *Campbell* aside, with respect to the In-Store Plaintiffs, Defendant has not shown that a valid agreement exists under "ordinary state-law principles that govern the formation of contracts." *First Options of Chicago v. Kaplan,* 514 U.S. 938, 944 (1995). Therefore, under basic contract principles, it would be similarly inappropriate to compel In-Store Plaintiffs to arbitrate.

A party seeking to compel arbitration must show that a valid agreement to arbitrate exists and that the other party is bound by the clause. *InterGen N.V. v. Grina*, 344 F.3d 134, 142 (1st Cir. 2003). Defendant, as the movant, has not satisfied its burden to show that arbitration is proper here for three reasons. First, Defendant has not established that the In-Store Plaintiffs had

---

infer that she was forced into attempting to register for the Loyalty Program online due to her in-store difficulties.

knowledge of the Loyalty Program's terms and conditions and therefore has not established that a valid agreement to arbitrate was formed.  Second, even assuming a valid agreement exists, such an agreement is unenforceable with respect to In-Store Plaintiffs, because it is unconscionable. Finally, the agreement is illusory with respect to all Plaintiffs.[7]

a.   The In-Store Plaintiffs Lacked the Requisite Knowledge to Contract

i.   Characterization of Plaintiffs' Lack-of-Knowledge Claim

At the outset, a determination must be made whether it is for the court or the arbitrator to decide whether a contract was formed between the parties.  Plaintiffs argue that they were never provided with the Loyalty Program's terms and conditions and therefore lacked the requisite knowledge to consent to a contract.  Defendant contends that Plaintiffs' argument amounts to an attack on the contract as a whole, rather than the arbitration clause contained therein. Defendant's characterization of Plaintiffs' argument is fair, simply because any failure by Plaintiffs to consent would render the entire contract a nullity, let alone its arbitration clause. However, Defendant is incorrect that the issue of contract formation should be decided by an arbitrator.

The Supreme Court has differentiated between two types of challenges to the validity of arbitration agreements: (1) challenges to the validity of an entire contract which contains an arbitration clause, and (2) challenges to the validity of the specific agreement to resolve the dispute through arbitration.  *Rent–A–Center,* 561 U.S. 63, 70 (2010); *Buckeye Check,* 546 U.S. at 444.  In a line of cases beginning with *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.,* 388 U.S. 395 (1967), the Supreme Court has held that challenges of the first type are for the

---

[7] These three grounds for denying Defendant's motion apply equally to the In-Store Plaintiffs' ADA claims, because any right to arbitrate must be part of a valid, enforceable contract.

11

arbitrator to decide, whereas challenges of the second type are for the courts to decide.

*Farnsworth v. Towboat Nantucket Sound, Inc.*, 790 F.3d 90, 96 (1st Cir. 2015) (citations

omitted).   Put another way, the Supreme Court teaches that "as a matter of substantive federal

arbitration law, an arbitration provision is severable from the remainder of the contract[,]" and

that, "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is

considered by the arbitrator in the first instance." *Buckeye Check*, 546 U.S. at 445–46.   There is,

however, a distinction between challenges to the issue of whether a contract containing an

arbitration clause is valid and the issue of whether the contract was ever formed.   *Rent-A-Center*,

561 at 70 n. 2; *Buckeye Check,* 546 U.S. at 444 n.1.   This is because the doctrine of severability

applies only to the former circumstance.   *Farnsworth,* 790 F.3d at 97 (citing *Rent–A–Center,* 561

U.S. at 70 n. 2).

Because the parties here dispute the contract's formation, the severability doctrine is not

implicated.   In *Farnsworth*, the First Circuit expressly recognized the importance of

distinguishing between contract validity and formation.   790 F.3d 90, 97.   Although the First

Circuit has not directly addressed whether the issue of contract formation is for the court or the

arbitrator, in *Farnsworth*, the court observed that a number of courts have held that where a party

argues that no contract was formed, the question of the formation or existence of the contract is

for the court, rather than the arbitrator.   *Id.* at 97 n.7.   This conclusion makes sense because

"[a]rbitration is strictly a matter of consent and thus is a way to resolve those disputes—*but only*

*those disputes*—that the parties have agreement to submit to arbitration."   *Granite Rock*, 561

U.S. at 299 (internal quotation marks omitted) (emphasis in original).   As the First Circuit noted

in *Farnsworth*, other courts are in accord.   *See SBRMCOA, LLC v. Bayside Resort, Inc.,* 707 F.3d

267, 274 (3rd Cir. 2013) ("[R]elevant distinction is between challenges to a contract's validity,

which are arbitrable, and challenges to a contract's formation, which generally are not.");
*Sanford v. Memberworks, Inc.*, 483 F.3d 956, 962–64 (9th Cir. 2007) (challenge to whether a contract was concluded must be determined by the court prior to arbitration); *Spahr v. Secco*, 330 F.3d 1266, 1268, 1272–73 (10th Cir. 2003) (holding that courts hear a party's challenge to the whole contract based on the claim that the signor did not have mental capacity to sign); *Sphere Drake Ins. Ltd. v. All Am. Ins. Co.*, 256 F.3d 587, 591 (7th Cir. 2001) ("[A]s arbitration depends on a valid contract[,] an argument that the contract does not exist can't logically be resolved by the arbitrator...."); *In re Morgan Stanley & Co., Inc.* 293 S.W.3d 182, 189-90 (Tex. 2009) (holding court should hear challenge to existence of contract containing arbitration provision); *Thompson v. Lithia Chrysler Jeep Dodge of Great Falls, Inc.*, 185 P.3d 332, 338 (Mont. 2008) (same).

In light of this weighty authority, questions regarding the formation or existence of a contract that contains an agreement to arbitrate is a gateway question for the court, not the arbitrator.  *See Granite Rock*, 561 U.S. at 296 ("[W]here the dispute at issue concerns contract formation, the dispute is generally for the courts to decide.") (internal citations omitted). Holding otherwise would be putting the cart before the horse.   Here, Plaintiffs argue that they never formed a contract with Defendant because they lacked knowledge of the Loyalty Program's terms and conditions.  As such, a challenge to the contract's existence is an issue for the court.  *See, e.g., Foss v. Circuit City Stores, Inc.*, 477 F. Supp.2d 230, 234–35 (D. Me. 2007) ("The distinction first articulated in *Prima Paint []* regarding the appropriate role for the court and the arbitrator is not determinative on questions regarding the very formation of a contract . . . . [A] challenge to whether a contract was ever validly concluded is for the court, and not the arbitrator, to decide."); *see also* Alan Scott Rau*, Everything You Really Need to Know about*

*"Separability" in Seventeen Simple Propositions*, 14 AM. REV. INT'L ARB. 1, 15 (recognizing

same).

## ii. The Existence of a Contract

Having determined that the issue of contract formation is properly for the court, the

analysis turns to whether the parties indeed formed a contract under ordinary principles of state

contract law.  It is axiomatic that absent notice of a contract's terms and conditions there can be

no "meeting of the minds" required for contract formation.[8] *Situation Mgmt. Sys. v. Malouf,* 430

Mass. 875, 878 (2000); *see also McCarthy v. Azure,* 22 F.3d 351, 354–55 (1st Cir.1994) ("[A]

party seeking to substitute an arbitral forum for a judicial forum must show, at a bare minimum,

that the protagonists have agreed to arbitrate some claims .... The federal policy presumes proof

of a preexisting agreement to arbitrate disputes arising between the protagonists.").  Therefore,

without knowledge of the existence of the agreement's terms and conditions, Plaintiffs could not

have assented to the Loyalty Program.  *Campbell*, 321 F. Supp.2d at 148 n. 2 ("[K]nowledge of

the offer is obviously a necessity for the inference of acceptance to hold.").

Defendant offers a slew of cases involving "clickwrap" agreements, where courts have

found acceptance of the agreement by a party who affirmatively clicked a box labeled "I agree"

on a screen that contained a link to the relevant terms and conditions. (#42 at 8-11.)  Such

agreements are routinely enforced by state and federal courts.  *See, e.g., Bagg v. HighBeam*

*Research, Inc.,* 862 F. Supp.2d 41, 45 (D. Mass. 2012); *Ajemian v. Yahoo,* 83 Mass. App. Ct.

565, 576 (2013) (collecting cases).   Defendant also cites numerous cases that stand for the

---

[8] The parties appear to disagree over whether Texas or Massachusetts law applies to the issue of whether
a valid contract was formed. Because this Court finds the principles relied upon to be so basic and can
discern no material difference between the states, it need not determine which law applies.  For ease of
reference, however, this Court will apply Massachusetts law to the issue of contract formation.

unremarkable principle that ordinarily, "one who signs a written agreement is bound by its terms whether he reads and understands them or not." *St. Fleur v. WPI Cable Sys./Mutron,* 450 Mass. 345, 355 (2008).  However, all of the cases Defendant relies on presume the party to be charged at least had minimal notice of the terms of the agreement.  *Cf. Specht v. Netscape Communications Corp.*, 306 F.3d 17, 35 (2nd Cir. 2002) ("Reasonably conspicuous notice of the existence of the contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility.").  Therefore the cases Defendant cites are of little relevance to this dispute.

Where, as here, the terms and conditions of the purported agreement were presented in a completely inaccessible manner, such that the In-Store Plaintiffs were not aware of their existence, there simply is no agreement to be enforced.  *See Dialysis Access Center, LLC v. RMS Lifeline, Inc.*, 638 F.3d 367, 376 (1st Cir. 2011) ("[T]he first principle that underscores all of the Supreme Court's arbitration decisions is that '[a]rbitration is strictly a matter of consent, and thus is a way to resolve those disputes—*but only those disputes*—that the parties have agreed to submit to arbitration.'" (internal quotation omitted) (emphasis in original).   The many cases Defendant cites presume, at the very least, that the resisting party had an opportunity to review, or a minimal awareness of, the contract terms at issue.   Not so here.  Defendant has failed to proffer any evidence that the In-Store Plaintiffs comprehended that the Loyalty Program's terms and conditions existed.   For Plaintiffs, who are blind customers, simply displaying the terms and conditions on the POS devices, without more, is insufficient to provide notice.  Defendant has not demonstrated that the agreement to arbitrate was provided to the In-Store Defendants in any meaningful way.  *See* 1 Williston on Contracts § 4:16 (4th ed.) ("As a general principle, an

offeree cannot actually assent to an offer unless the offeree knows of its existence.").[9]

This Court, however, finds that Plaintiff Lineback is bound by the Loyalty Program's terms and conditions.   Plaintiff Lineback admits that she enrolled in the Loyalty Program using her home computer and by providing her email address, but does not "recall" being presented with the terms and conditions.  (#55, Ex. D.)  Defendant presented evidence, however, that to enroll online, Plaintiff Lineback must have checked a box that reads "□ I agree to the <u>POP! terms and conditions</u>".  The underlined portion of the text directly next to the box serves as a link to the terms and conditions.  (#42-1 ¶ 6.)  The In-Store Plaintiffs' circumstances are different because it is unclear whether they were aware of the existence of the terms and conditions.   Here, Plaintiff Lineback used her computer to enroll, was required to click the box to enroll, and had an opportunity to review the terms and conditions by clicking on the link next to the acceptance box.  Because Plaintiff Lineback was able independently to enroll in the Loyalty Program, she is bound by its terms and conditions.  Whether she "recalls" being presented with the terms and conditions is irrelevant, because Plaintiff Lineback is subject to the basic rule that one who signifies assent to an agreement is bound by its terms whether or not she reads them.  *See, e.g., Spritz v. Lishner*, 355 Mass. 162 (1969).

Here, under ordinary principles of state contract law, Defendant has failed to meet its

---

[9] At oral argument, Defendant argued that the In-Store Plaintiffs had constructive notice of the terms and conditions because they remained enrolled in the Loyalty Program.  However, Defendant has submitted no evidence demonstrating that the terms and conditions were subsequently communicated to the In-Store Plaintiffs in any meaningful way. While Defendant states that follow-up emails containing a link to the terms and conditions are sent to members of the Loyalty Program, Defendant has failed to demonstrate whether those links are conspicuously displayed or rather buried among a deluge of information. Defendant further suggested at argument that the In-Store Plaintiffs are bound by the Loyalty Program because they continued their membership and therefore received the program's benefits, similar to an employee who becomes bound by the terms of her employment by remaining employed, thereby reaping the benefits of employment.  Defendant has not submitted any evidence, however, to demonstrate the In-Store Plaintiffs reaped the benefit of the Loyalty Program.  Without any such evidence, Defendant has not met its burden and no agreement can be presumed.

burden to demonstrate that the In-Store Plaintiffs properly consented to the arbitration provision found in the Loyalty Program's terms and conditions.  However, the terms and conditions are binding on Lineback.

b. Unconscionability of the Agreement to Arbitrate

Plaintiffs argue that the Loyalty Program's arbitration clause cannot be enforced because it is unconscionable.  For many of the reasons stated above, this Court agrees that the arbitration clause is unconscionable with respect to the In-Store Plaintiffs but not with respect to Plaintiff Lineback.  Assuming *arguendo* an agreement was formed, under Texas law,[10] agreements to arbitrate are valid unless grounds exist at law or in equity for revocation of the agreement.  *Royston, Rayzor, Vickery, & Williams, LLP v. Lopez*, 467 S.W.3d 494, 500 (Tex. 2015).  Because arbitration is favored, the burden of proving such a defense—*e.g.*, fraud, unconscionability or voidness under public policy—falls on the party opposing the contract.  *Id.*  As the Texas Supreme Court recently explained:

> Arbitration agreements may be *either substantively or procedurally* unconscionable, or both. *See In re Halliburton Co.,* 80 S.W.3d 566, 572 (Tex.2002) ('[C]ourts may consider both procedural and substantive unconscionability of an arbitration clause in evaluating the validity of an arbitration provision.'). 'Substantive unconscionability refers to the fairness of the arbitration provision itself, whereas procedural unconscionability refers to the circumstances surrounding adoption of the arbitration provision.' *In re Palm Harbor Homes, Inc.,* 195 S.W.3d 672, 677 (Tex.2006). Arbitration is strongly favored. *J.M. Davidson,* 128 S.W.3d at 227.

*Royston*, 467 S.W.3d at 499 (emphasis added).  The circumstances surrounding the arbitration agreement at the time it was formed determine whether the provision is procedurally unconscionable.  *BBVA Compass Investment Solutions, Inc. v. Brooks*, 456 S.W.3d 711, 724

_____

[10] Unlike the question of contract formation, Texas law applies to determine whether the agreement to arbitrate is illusory or unconscionable, because the Loyalty Program's terms and conditions provide that Texas law governs questions of interpretation.

(Tex. App. 2015).  In the case of the In-Store Plaintiffs, there is no evidence to show that they had notice of the Loyalty Program's terms and conditions, and therefore enforcement of the arbitration clause contained therein would result in oppression and unfair surprise.  *BBVA Compass Investment Solutions, Inc.,* 456 S.W.3d at 724 ("Situations that are procedurally unconscionable involve those in which one of the parties was incapable of understanding the agreement without assistance, and the other party did not provide that assistance . . . ."); *see also Delfingen US-Texas, L.P. v. Valenzuela,* 407 S.W.3d 791, 801 (Tex. App. 2013) (agreement to arbitrate procedurally unconscionable where relevant documents not provided in an accessible manner to illiterate party and contents of the documents mischaracterized).  As noted above, in determining procedural unconscionability courts typically focus on the facts surrounding the bargaining process.  *See In re Halliburton Co.*, 80 S.W.3d at 571.  Here there was no bargaining process.  Thus, the circumstances surrounding the In-Store Plaintiffs' purported acceptance of the Loyalty Program's terms and conditions are "sufficiently shocking" and support a finding of unconscionability.  *Delfingen US-Texas, L.P.*, 407 S.W.3d at 798; *see also Estate of Benitez v. Sears, Roebuck and Co.*, No. 13-CV-0468, 2013 WL 4223875, at *4 (N.D.Tex. 2013) (Typically, "where illiteracy has given rise to unconscionability, not only has the signatory been illiterate, but other facts have indicated that he was not informed of the arbitration provision.").

Conversely, this Court finds nothing shocking about the circumstances surrounding Plaintiff Lineback's enrollment in the Loyalty Program and therefore the arbitration agreement is not unconscionable with respect to her.

### c.   The Agreement to Arbitrate is Illusory

Plaintiffs further argue that the arbitration clause at issue is illusory because the Loyalty Program's terms and conditions provide Defendant with the right to modify the terms at any

time.  Under Texas law, an arbitration clause is illusory if one party "can avoid its promise to arbitrate by amending the provision or terminating it altogether." *In re 24R, Inc.,* 324 S.W.3d 564, 567 (Tex. 2010).  Stated differently, if one party to the agreement "can suddenly change the terms of the agreement to avoid arbitration, then the agreement was illusory from the outset." *Carey v. 24 Hour Fitness, USA, Inc.,* 669 F.3d 202, 205 (5th Cir. 2012).  "The crux of this issue is whether [one party] has the power to make changes to its arbitration policy that have retroactive effect, meaning changes to the policy that would strip the right of arbitration from [the other party] . . . ." *Id.*

The Fifth Circuit's decision in *Morrison v. Amway Corp.* is instructive.  517 F.3d 248 (5th Cir. 2008).  The *Morrison* case concerned a distribution agreement that required all distributors to comply with certain "Rules of Conduct" as they were "amended and published from time to time in official Amway literature." *Id.* at 253.  The Rules of Conduct contained an arbitration provision, and the court determined that there was "nothing in any of the relevant documents which preclude[d] . . . elimination of the entire arbitration program or its applicability to certain claims or disputes so that . . . mandatory arbitration would no longer be available even as to disputes which had arisen and of which Amway had notice prior to publication [of the change]." *Id.*  Applying Texas law, the court in *Morrison* reasoned that because Amway retained the ability to amend its arbitration policy even as to disputes already underway, the agreement to arbitrate was illusory. *Id.*

In so holding, the court in *Morrison* distinguished the facts from those in *In re Halliburton Co.,* 80 S.W.3d 566 (Tex. 2002).  In *In re Halliburton Co.,* the court found the arbitration agreement at issue was not illusory based on two key provisions:  one stated that "no amendment shall apply to a [d]ispute of which [Halliburton] had actual notice on the date of

amendment"; and the second stated that any termination of the arbitration program "shall not be effective until 10 days after reasonable notice of termination is given to [e]mployees or as to [d]isputes which arose prior to the date of termination." *Id.* at 569-70.  Based on these two provisions, the court determined that "Halliburton cannot avoid its promise to arbitrate by amending or terminating it altogether." *Id.*  Further, it was the lack of such a "*Halliburton* type savings clause[]" that led the court in *Morrison* to hold that the arbitration clause at issue was illusory.  517 F.3d at 257.

More recently, in *Carey*, the Fifth Circuit relied on *Morrison* and *Halliburton* in holding that an arbitration provision that was silent as to retroactive application was illusory.  *Carey*, 669 F.3d at 206.  The court found it crucial that "[a]s in *Morrison*, there is no '*Halliburton* type savings clause' to preclude the employer's ability to make retroactive modifications to the arbitration provision." *Id.* ("In effect, the agreement allows [the employer] to hold its employees to the promise to arbitrate while reserving its own escape hatch.").[11]

Applying these principles, this Court finds that Defendant's agreement to arbitrate is illusory and therefore unenforceable.  As in *Morrison* and *Carey*, nothing in the Loyalty Agreement's terms and conditions prevents Defendant from retroactively eliminating its arbitration obligation, "which is the critical inquiry for determining whether an agreement is illusory." *Carey*, 669 F.3d 207.  Here, in a provision labeled "Changes to the Terms," the Loyalty Program's terms and conditions provide:

> We reserve the right, at our discretion, to change, modify, cancel, add or remove any or all portions of these terms, any policy, FAQ, or guideline pertaining to the [Loyalty Program] at any time. If any terms change in the future, we will let you

---

[11] Although these cases occurred in the employer-employee context, this Court sees no reason why their rationale should not apply with equal force here, particularly given the import of the discrimination claims at issue.

know by posting an update to www.containerstore.com/pop with the most recent modification date. Any changes or modifications will be effective immediately upon posting the revision and you waive any right you have to receive special notice of such change. By continuing to use the [Loyalty Program], you agree to the revised terms.

(#42-1, Ex. A at 1.) Yet another paragraph labeled "Additional Terms" states:   "[Defendant] reserves the right, without limitation, to terminate, change, limit, modify, or cancel any [Loyalty Program] terms, conditions, rules, regulations, benefits . . . at any time, with or without notice, even though such changes may affect the value of already-issued . . . benefits.  *Id.* at 3.  Taken together, these provisions clearly imbue Defendant with the unilateral right to modify the arbitration clause set forth in the Loyalty Program's terms and conditions.  The court in *Carey* expressly rejected this type of arbitration clause, observing that "silence about the possible retroactive application of amendments to the arbitration policy [is] interpreted as allowing amendments to apply retroactively."  669 F.3d at 206-07 (citing *Torres v. S.G.E. Mgmt., LLC,* 397 Fed. Appx. 63, 68 (5th Cir. 2010) (unpublished opinion)).

As an additional matter, the notice requirements under the Loyalty Program's terms and conditions are in conflict.  Under the paragraph labeled "Changes to the Terms," any amendment will be posted to Defendant's Loyalty Program website, while the customer expressly waives any right to individual notice.  (#42-1, Ex. A at 1.)  Under the paragraph labeled "Additional Terms," Defendant reserves the right to terminate or modify any Loyalty Program term or condition at any time, with or without notice.  Even assuming the "Changes to the Terms" requires notice of a modification, such notice is not enough.  Nor is acceptance by the customer of any such changes sufficient to save the clause.  As *Carey* makes clear, mere notice and acceptance of the changes are not sufficient safeguards when retroactive amendment is possible. 669 F.3d 202 (citing the holdings in *Morrison* and *Torres* in support of this rule).

Defendant argues that the arbitration provision is not illusory because Plaintiffs were free to cancel their membership in the Loyalty Program at any time, including after any change in terms.[12] (#42, Ex. A at 2.)  This argument misses the point.  Defendant maintains the unilateral right to modify the terms and conditions of the Loyalty Program, including the arbitration provision therein.  The Loyalty Program's language is silent on the possibility of retroactive modification and therefore implicates "the fundamental concern driving this line of case law" which is "the unfairness of a situation where two parties enter into an agreement that ostensibly binds them both, but where one party can escape its obligations under the agreement by modifying it."  *Carey*, 669 F.3d at 209; *see also Domenichetti v. Salter School, LLC*, No. 12-11311-FDS, 2013 WL 1748402, at *5 (D. Mass. Apr. 19, 2013) (citing *Carey*, while applying Massachusetts law, in holding unilateral discretion to alter terms of arbitration provision rendered agreement to arbitrate illusory); *Douglas v. Johnson Real Estate Investors, LLC,* 470 Fed. Appx. 823, 825 (11th Cir. 2012) (under Massachusetts law, declaring employee's agreement to arbitrate was unenforceable because employer retained unilateral right to alter terms) (unpublished opinion).  This concern is particularly acute under the circumstances of this case, where Plaintiffs have asserted discrimination claims.  *See Carey*, 669 F.3d at 209 (recognizing concern heightened where no definite notice window required and potential for amendments to become binding immediately upon "'official written notice'").

Because Defendant retains the unilateral right to change the terms of the arbitration

---

[12] In its Reply, Defendant also argues that the duty of good faith and fair dealing makes "'change-in-terms'" provisions non-illusory as a matter of law.  (#60 at 8-10.)  However, Defendant fails to cite any Texas law in support of this proposition. As previously mentioned at note 10, Texas law governs the interpretation of the Loyalty Program's terms, pursuant to the choice-of-law provision contained therein. In its opening Memorandum of Law, Defendant urged this Court to apply Texas law to the parties' relationship. (#42 at 7.)

provision, such a right renders any promise to arbitrate illusory.  The agreement to arbitrate is therefore unenforceable.

IV.     <u>CONCLUSION</u>

For the foregoing reasons, I RECOMMEND that Defendant's Motion to Enforce Arbitration and Class Action Waivers and Stay Action (#42) be DENIED.

V.      <u>REVIEW BY DISTRICT COURT</u>

The parties are hereby advised that any party who objects to these proposed findings and recommendations must file a written objection thereto within fourteen days of receipt of this Report and Recommendation.  The written objections must identify with specificity the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections.  *See* Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b).  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  *See Keating v. Secretary of Health & Human Servs.*, 848 F.2d 271, 274-75 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-79 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604-05 (1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140, 153-55 (1985).

 /s / M. Page Kelley                                  
M. Page Kelley
United States Magistrate Judge

March 11, 2016