UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

***************************

NATIONAL FEDERATION
OF THE BLIND et al,
      Plaintiffs

vs.                          Case No. 1:15-cv-12984-NMG

THE CONTAINER STORE, INC.,
      Defendant

***************************

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE M. PAGE KELLEY
AT BOSTON, MASSACHUSETTS
ON MARCH 9, 2016

APPEARANCES:

For the Plaintiffs:
Jeremy Y. Weltman, Esquire
Kerstein, Coren, Lichtenstein, LLP
60 Walnut Street, 4th Floor
Wellesley, Massachusetts 02481
781-997-1600

Jana Eisinger, Esquire *(Telephonically)*
Martinez Law Group, PC
720 South Colorado Boulevard, Suite 1020
Denver, Colorado 80246
303-597-4000

Transcriber:  Karen M. Aveyard,
               Approved Federal Court Transcriber

--------------------------------------------------

**TRANSCRIPTION PLUS**
**1334 ELM STREET**
**LEOMINSTER, MASSACHUSETTS 01453**
**(978) 466-9383**
**www.transcriptionplus.com**

APPEARANCES (continued):

For the Plaintiffs:
Scott C. LaBarre, Esquire *(Telephonically)*
LaBarre Law Office, PC
1660 South Albion Street, Suite 918
Denver, Colorado 80222
303-504-5979

Timothy Elder, Esquire *(Telephonically)*
TRE Legal Practice
4226 Castanos Street
Fremont, California 94536
410-415-3493

For the Defendant:
Gregory F. Hurley, Esquire *(Telephonically)*
Michael J. Chilleen *(Telephonically)*
Shepphard Mullin Richter & Hampton, LLP
650 Town Center Drive, 4th Floor
Costa Mesa, Florida 92626
714-513-5100

P R O C E E D I N G S

1

2

3        THE CLERK:  Today is Wednesday, March 9, 2016, and we

4  are on the record in Civil Case No. 15-12984, the National

5  Federation of the Blind et al versus The Container Store, Inc.,

6  the Honorable M. Page Kelley presiding.

7        Would counsel please identify yourselves for the

8  record.

9        THE COURT:  Hi.  Let's start with the defendants

10  identifying themselves, please.

11        MR. HURLEY:  Greg Hurley for the defendant, your

12  Honor, and I should be joined by Mike Chilleen.  I don't know

13  if he's on yet.

14        THE COURT:  Okay.  You expect to be joined by Michael

15  Chilleen?

16        MR. HURLEY:  Yes, but if he's not on yet, we can start

17  whenever you're ready.

18        THE COURT:  Okay.  I think because we're so late, I'd

19  prefer to go ahead and get started.

20        But are you sure you don't object to that?

21        MR. HURLEY:  I don't object to that, your Honor.

22        THE COURT:  Okay.  So we have Mr. Hurley for the

23  defendants, and who is on for the plaintiffs?

24        MS. EISINGER:  This is Jan Eisinger.  I'm one of the

25  counsel for the plaintiffs.

1         THE COURT:  Okay, Ms. Eisinger.

2         MR. LaBARRE:  This is Scott LaBarre on behalf of the

3    plaintiffs.

4         THE COURT:  Okay, Mr. LaBarre.

5         MR. ELDER:  Hello?

6         THE COURT:  Yes?

7         MR. ELDER:  Hello, your Honor.  This is Timothy Elder

8    from TRE Legal Practice in California, also for plaintiffs.

9         THE COURT:  Okay.

10        MR. WELTMAN:  And, your Honor, good afternoon.  Jeremy

11   Weltman for the plaintiffs.

12        THE COURT:  Okay.  So we'll be listening to see if

13   Mr. Chilleen joins us, but Mr. Hurley, you think you're

14   prepared to go forward?

15        MR. HURLEY:  Yes, your Honor.

16        THE COURT:  Yes.  Good.  Okay.

17        So I just want to apologize.  I know we're very late.

18   That doesn't happen often at all, but we just had a hearing

19   that went way over that we hadn't anticipated taking so long

20   right before you.

21        So we're here for the defendant's motion -- a hearing

22   on the defendant's motion to enforce the arbitration and class

23   action waivers and to stay the action, which is Document 42 on

24   the docket, and I'll hear the defendants first and then the

25   plaintiffs.  And I think the way we'll conduct this is if you

1    want to take a break and let the other side react to what

2    you've said, that's fine, and you can always pick back up

3    again.  And also, at the end of the hearing I'll take a short

4    break, just two or three minutes, and then come back just to

5    see if I have any follow-up questions for anyone.

6              So I'll hear the defendant.  Thank you.

7              MR. CHILLEEN:  Yes.  This is Mike Chilleen on behalf

8    of The Container Store.

9              So on the motion to compel arbitration, it seems to me

10   that the primary argument here is whether the plaintiffs agree

11   to the arbitration provision, and we have cited caselaw in our

12   reply brief to the effect that lack of consent, whether it be

13   based on blindness or you can't read or you don't understand a

14   language, have all been uniformly rejected by the courts on

15   policy grounds.  The courts basically explain that you cannot

16   have two different rules of contracts, one set for those who

17   can read and another set for those who cannot.  If you can't

18   read, then you basically have a duty to have the contract read

19   to you, or to not enter into the contract in the first place.

20             And so blind people are free to enter into contracts

21   and they can expect and compel the other party to comply with

22   their obligations, but they also have to meet their own

23   obligations.  They don't get to pick which contracts or which

24   particular provision of the contracts they want to be bound by.

25   And this concept is entrenched in contract law.  It's a core

1   principle.  We cite a ton of cases in our reply brief.  In

2   plainness, we're not able to cite a single case where a blind

3   person was not held to his contract.

4         In addition, after the plaintiffs enrolled, they were

5   sent welcome e-mails confirming that they enrolled, they were

6   sent routinely promotional e-mails, and each of those e-mails

7   contained links to the terms and conditions.  Plaintiffs were

8   free to cancel at any time and they never did.  So under these

9   circumstances, we believe that it cannot be said that the

10  plaintiffs do not agree to arbitrate.

11        Another threshold issue before the Court even gets to

12  that is, is the arbitrator who decides in the first instance

13  and not the Court where the plaintiffs agree to arbitrate.  We

14  cited caselaw in our brief that basically says that when you're

15  challenge to arbitration goes to the entire contract and not

16  just the arbitration provision, then the issue has to be cited

17  by the arbitrator first.

18        And so here plaintiffs are saying they didn't get to

19  read the contract at all, so their lack of consent based on the

20  fact that they can't read goes to the entire contract and not

21  just to the arbitration provision.  So that issue has to be

22  cited by the arbitrator and not the Court.

23        Plaintiffs also make some additional arguments.  They

24  claim that the arbitration agreement provision is illusory

25  because there's a change in terms provision whereby the

1    defendant can change the terms of the loyalty program.  So we

2    cite caselaw in our brief that change in term provisions are

3    not illusory because there's a duty of good faith and fair

4    dealing inherent in contracts.  And in this case, of course,

5    the defendant is not trying to get out of their obligation to

6    arbitrate, they're actually trying to enforce it.

7            And once again, the plaintiffs, it says right in the

8    loyalty program that the plaintiffs are free to cancel the

9    loyalty program at any time and they are free to reject any

10   changes that The Container Store may make, and in this case, of

11   course, no changes were made to the arbitration agreement or to

12   the loyalty program.

13           Plaintiffs also claim that the forum provision is

14   unconscionable as well as the fee shifting provision.  And so

15   the forum provision provides that arbitration should be held in

16   Texas and, you know, we cite caselaw that courts routinely

17   uphold out-of-state forum provisions, there's nothing

18   unconscionable about those provisions, and plaintiffs have not

19   been able to cite a single case to support their position.  And

20   especially in this case when the plaintiffs are seeking, by way

21   of a nationwide class action, to force defendants and

22   out-of-state class members all over the country to litigate in

23   Massachusetts, and they even propose subclasses in Texas.  So

24   we don't think their forum argument is valid.

25           The same thing for their fee shifting, the fee

1    shifting provision.  Under the caselaw they have to show a high

2    probability that the cost of arbitration would prevent them

3    from pursuing their legal rights, and they have to do that

4    through a declaration that explains their financial condition,

5    et cetera, and they have not submitted any declarations, and in

6    fact they could not because they're being financed by the

7    National Federation of the Blind, who is seeking to, you know,

8    pursue a nationwide class action, where the plaintiffs could

9    have, you know, pursued individual claims inexpensively.

10          Finally, the caselaw says even if the Court, you know,

11   finds that the change in term provision or the forum provision

12   or the fee shifting provision is unconscionable, then the

13   proper course of action is to simply sever it and to enforce

14   the remainder of the arbitration agreement.  The Court should

15   not invalidate the entire arbitration agreement.

16          Finally, plaintiffs argue that the arbitration clause

17   does not cover certain of their claims.  So they can see that

18   it's, you know, a broad arbitration clause because the language

19   covers any dispute between the parties, and we cite caselaw

20   that that type of language, any dispute, covers contract

21   disputes, tort disputes and statutory claims.

22          They don't seem to -- they seem to concede that since

23   they're directly challenging the loyalty program, that those

24   claims would be subject to arbitration and covered by the any

25   dispute clause, but they argue that their point of sale claims,

1    that the point of sale devices are not accessible, are not

2    covered, by the arbitration clause.  But that's explained in

3    our papers.  Customers have to associate their purchases with

4    their membership at the time of sale in order to participate in

5    the loyalty program.  So the plaintiffs' claims that they

6    cannot use the point of sale devices to make purchases to earn

7    rewards under the loyalty program are related to the loyalty

8    program, and under the caselaw they have to show that the

9    arbitration clause is not susceptible to any interpretation

10   that it covers the dispute, and they have not shown that.

11          The final argument is whether the Court, if

12   arbitration is granted, should stay all of the claims or just

13   the claims of the named plaintiffs that enrolled in the loyalty

14   program, and we cite caselaw to the effect that when some

15   claims are subject to arbitration and other claims are not

16   subject to arbitration, then the Court should stay all the

17   claims if they involve combinations of fact or law.  In this

18   case the plaintiffs would seek to litigate the exact same

19   claims, both in arbitration and in federal court.  For the sake

20   of efficiency and to avoid conflicting rulings, we believe the

21   Court should stay all claims.

22          And that's kind of the gist of our arbitration motion.

23          THE COURT:  So let me ask you just a couple of

24   questions.

25          What law applies to this, is it Texas?

1          MR. CHILLEEN:  We believe that Texas law applies

2     because there's a choice of law provision in the arbitration

3     agreement.  Plaintiffs claim that Massachusetts law applies.

4     What we tried to do is to show that it doesn't matter.  We

5     cited Texas law, Massachusetts law, First Circuit caselaw, you

6     know, on all these issues to say that regardless of which law

7     applies, the result is the same.

8          THE COURT:  And is it true that your position is that

9     the claims brought by the NFB, Mr. Cadigan and Ms. Albright,

10    don't have anything to do with this dispute over the

11    arbitration?

12         Your argument that the case should go to arbitration

13    does not apply to those people, right, or the --

14         MR. CHILLEEN:  Well, I'm saying that all the claims

15    should be stayed pending arbitration.  But right, those two

16    particular individuals, we're not disputing that they did not

17    enroll in the loyalty program.

18         THE COURT:  Okay.  And is it also -- if I can just ask

19    you, can you explain why if people can't -- well, first of all,

20    I think it's your burden to show that the agreement was

21    communicated in such a way that these people had notice of

22    their waiver of their right to proceed in a judicial forum,

23    right?

24         MR. CHILLEEN:  Well, I mean, I think in general terms

25    it's our burden to show that there was an agreement to

1    arbitrate, but again --

2           THE COURT:  So why do you -- how have you shown that

3    there's an agreement to arbitrate?

4           MR. CHILLEEN:  Because a blind person, or someone who

5    can't read, or someone who doesn't understand the language, has

6    a duty to have the contract read to them.  That's what all the

7    caselaw says.

8           THE COURT:  What if they don't know there's a

9    contract?

10          MR. CHILLEEN:  Well, I don't think there's any dispute

11   here that the plaintiffs knew that they were enrolling in the

12   loyalty program.  So I understand that, you know, if no one

13   tells them anything, they're not going to be aware of a

14   contract that they're enrolling or anything, then you could

15   make that argument, but in the cases cited, someone knows

16   they're entering into a loan, they (inaudible) they're blind.

17          THE COURT:  Right, but I think there's a difference

18   between knowing that you're entering into a loan agreement and

19   knowing that you're entering into a loyalty program where you

20   may not -- I mean, have you really proven that they understood

21   they were entering into a contract where they gave up their

22   rights?

23          MR. CHILLEEN:  Well, I believe that we proved they --

24          THE COURT:  Like, I'm just imagining someone at the

25   cash register who says do you want to sign up for the loyalty

1    program, and you say yes, and they say what's your e-mail,

2    what's this, what's that, and you can't see what they're doing.

3    And then the next thing you know you're enrolled, but you

4    didn't know about the -- that there was a contract to be read

5    to you.

6         Like, if you're doing a loan, if you're signing loan

7    papers, I think you would know you're signing something, but do

8    these -- do you have any evidence that the people across the

9    counter said anything to these plaintiffs like oh, let me read

10   you the contract, or do you want me to read you the contract?

11        MR. CHILLEEN:  Well, they inform them that they're

12   agreeing to terms and conditions.

13        THE COURT:  They did?

14        MR. CHILLEEN:  I can't say exactly what the particular

15   cashiers said.  I can say what our customer practice is, is

16   that they ask them if they want to enroll, they say yes, and

17   they say okay, you have to agree to the terms and conditions

18   first.

19        THE COURT:  So is that anywhere in your -- in the

20   papers you've submitted, that that's your practice?

21        MR. CHILLEEN:  Well, everything we describe would be

22   in the Declaration of Joan Manson.

23        THE COURT:  Okay.  I'll take a look at that.

24        MR. CHILLEEN:  So I couldn't give you specifics.

25   We're not exactly sure, you know, what happened on each

1    particular date, but the customer practice would be to inform

2    them that they have to agree to terms and conditions, and they

3    said yes.  They can't enroll unless they indicate yes.

4           THE COURT:  Okay.  Because all I've seen is that

5    someone was available to read them the contract, but not that

6    someone informed them that there was a contract.  But I don't

7    have Ms. Manson's declaration in front of me, but I'll take a

8    look at that.

9           Would you agree that if they're not told, if you're

10    blind and you're not told you're agreeing to a contract, that

11    that is not providing a reasonably prudent party that they're

12    waiving rights?

13           MR. CHILLEEN:  But it depends on the particular

14    circumstances.  I mean, you know, if someone is told they're

15    enrolling in a program that has terms and conditions and

16    there's a brief description of what they are, and that they

17    have to agree to the terms, then I think they're definitely on

18    notice and they have a duty to have the contract read to them.

19    Or subsequently, when they're e-mailed the welcome e-mails,

20    which have on their own computer at home, which all of them

21    were, and to have a link to terms and conditions, and they can

22    read it, and if they didn't like it, then they could cancel any

23    time.  Instead, each of them continued to use the reward

24    program, continued to use the benefits, way after they were

25    enrolled.

1          So, you know, to the extent there was any problems at

2     enrollment, it sure was satisfied later when they had multiple

3     occasions or several over months to cancel any time when every

4     single e-mail sent to them had a link to the terms and

5     conditions.

6          THE COURT:  Okay.

7          MR. CHILLEEN:  There's caselaw that says that, you

8     know, for example, in the employment context, when someone

9     gives you the terms, but they don't give them to you right then

10    and there, they say, you know, check your e-mail or something,

11    and it's presumed that the person acquiesced to them by

12    continuing to work there.  It's a similar argument here.  Even

13    if there's any deficiency at the time of enrollment, by

14    continuing to participate in the rewards and to earn the

15    benefits of the contract, then they have to be held to their

16    obligation as well.  They can't just pick and choose.

17         THE COURT:  Okay.  Well, let me hear from the

18    plaintiffs, and then if you would like a chance to say anything

19    else, you're welcome to.

20         Is that all right?

21         MR. CHILLEEN:  Thank you.

22         THE COURT:  Okay.

23         MR. WELTMAN:  Your Honor, in an effort for the

24    multiple plaintiffs to not talk over each other, I'm going to

25    go ahead and see the floor here to my co-counsel, Jana

1    Eisinger, and then I'll pop in if I think there's something

2    that needs to be said in addition.

3                THE COURT:  Okay.  Ms. Eisinger, please go forward.

4                MS. EISINGER:  Yes.  Thank you, your Honor.

5                I think that you hit on a lot of the key points that

6    we were going to make with your questions to Mr. Chilleen, but

7    I'd like to point out your question about whether or not the

8    terms and conditions were made known to the plaintiff

9    (inaudible).  There is nothing in the declaration of Ms. Manson

10   that says that the terms and conditions are made known to the

11   plaintiffs, and the discovery responses that we attached to our

12   opposition makes clear that there was nothing that was told to

13   them other than yeah, let's sign you up and get your e-mail

14   address and telephone number.  There was no reference

15   whatsoever that they had been waiving their right to bring a

16   lawsuit, that they'd be agreeing to fly to Texas for an

17   arbitration, or any of the other outrageous things that are in

18   these terms and conditions that they're trying to enforce.

19               THE COURT:  If I can just ask you a question about

20   that.  I'm a little concerned about Ms. Lineback and her

21   signing up herself online because would she not have performed

22   one of these click wrap procedures in order to do that herself?

23               MS. EISINGER:  You're absolutely right, that her

24   situation is distinct because she signed up online, but our

25   position is that the burden is on the defendant, as you know,

1  by a preponderance of the evidence to show that the arbitration

2  agreement was formed.

3          Ms. Lineback, who is blind and uses a reader, JAWS

4  reader, and this is in her discovery responses, had no

5  opportunity, was given no terms and conditions.  They didn't

6  appear at all for her.  Now, the evidence that The Container

7  Store has put forward that she agreed was she must have agreed

8  because she signed up, but they didn't put anything else

9  forward.  They don't have any proof that she actually

10  acknowledged it, accepted it, or that it was accessible to her

11  in any form or manner.  So we just feel that they have not met

12  their burden.

13          There's a dispute, she denies that she accepted it,

14  and then they haven't met their burden to show that she was on

15  notice of it, that it was accessible in any manner.  And I

16  think that point really hits across all these issues, which is

17  the unbelievable gall of The Container Store to be fighting

18  with blind plaintiffs who say that they can't access their

19  store, they can't access their point of sale devices, they

20  can't access their loyalty programs, by tricking them into

21  agreeing to waive their right to fight the very thing that

22  they're saying is not accessible to them.

23          So with the point of sale devices, that's their entire

24  defense, but well, I'm sorry that they're blind, they couldn't

25  see it, but it doesn't matter, they're still bound to it, and

1   all the cases that they cite are completely inapposite because

2   those cases involve people who actually consented to terms.

3   They actually had signatures.  They actually agreed.  Our case,

4   the threshold question is was an arbitration agreement ever

5   formed.  We say it was not.  There's absolutely no evidence

6   that an agreement to arbitrate was ever formed.

7           And to the defendant's point that the arbitrator is

8   supposed to decide, that's absolutely wrong.  In Buckeye, which

9   is one of the Supreme Court cases that first set forth this

10  whole doctrine with severability, the court says that "The

11  requirement that courts treat an arbitration clause as

12  severable from the contract in which it appears and enforce it

13  according to its terms unless the party resisting arbitration

14  specifically challenges the enforceability of the arbitration

15  clause itself, or claims that the agreement to arbitrate was

16  never concluded."

17          So where we claim, as we do here, the agreement to

18  arbitrate was never concluded, there is zero evidence that any

19  of these plaintiffs actually agreed to arbitrate any of their

20  claims.  Then the court must decide those facts.

21          So I think turning to the --

22          THE COURT:  So if I can just stop you right there for

23  a second.

24          MS. EISINGER:  Okay.

25          THE COURT:  So my reading of that line of cases,

1   including Nitro-Lift, which is the 2012 case from the Supreme

2   Court, is that if you're attacking the validity of the whole

3   contract, the arbitrator is to have the first crack at that,

4   whereas if you're just attacking the validity of the

5   arbitration clause itself, then the court makes that

6   determination.

7        So can you just articulate for me exactly, precisely,

8   under that rule what your argument here is.

9        MS. EISINGER:  Yes, yes, and I think that it's an

10  important distinction, where even in Buckeye there's a footnote

11  where the court makes clear that contract validity is different

12  from whether or not a contract was ever formed, meaning did

13  somebody ever sign something.  That's whether a contract was

14  ever formed.  That remains with the court, whether the validity

15  of the contract -- if I signed a contract without reading it

16  and you had my signature on that contract and I didn't

17  challenge the arbitration provision itself, but I agreed to the

18  entire contract, then the severability provision would kick in

19  and you would say well, you signed it, you consented, and your

20  contract defenses will go to the arbitrator.  But here there's

21  no arbitration agreement ever formed, so you can't, on the one

22  hand, claim, your Honor, you agreed to something by shopping in

23  a store and now I'm going to force you to argue in front of an

24  arbitrator that you never agreed to arbitrate.  Backwards.  I

25  think the first threshold question is whether an arbitration

1    agreement was ever formed and that's for you to decide, and our

2    position is that there's no evidence whatsoever that the

3    agreement was ever formed.

4         So if you go past the fact that they never signed

5    anything and that they're disputing that they had notice, and

6    that nothing in what The Container Store has provided shows

7    that they were at all put on notice of any kind of contract

8    that would waive any important rights, going past that and

9    looking at whether or not you can put them on constructive

10   notice, which I think is what Mr. Chilleen is essentially

11   arguing, that they should be on constructive notice, even

12   though they weren't on actual notice.

13        So to that line of cases I think Judge Gorton had one

14   case, the Schachter case, which blames the defendant's burden,

15   and they have to have reference to finding terms explicitly

16   made and evidence demonstrating affirmative assent to those

17   terms.  That was the standard that this court has set forth.

18   And I think from what you've seen of what they presented, there

19   is no proof that binding terms were explicitly made.  Instead,

20   they're trying to switch the burden, that blind customers are

21   somehow supposed to (inaudible) that there's some contract that

22   they're being held to and ask to have it read to them, which is

23   ludicrous, and there's no evidence demonstrating affirmative

24   assent to any terms.

25        Again, how can you affirmatively assent to terms that

1   are never even disclosed to you?

2          So we look at this entire motion as really a shocking

3   example of how far this defendant will go to try to -- rather

4   than provide accessibility, which is what this case is all

5   about, instead try to trick these customers into waiving their

6   rights and avoid having to abide by the ADA and the state

7   discrimination laws.

8          THE COURT:  Okay.

9          MS. EISINGER:  And I think on the last point about the

10  clients who are not -- that they don't move to compel

11  arbitration, you know, most of the NFB and two of the clients

12  didn't sign up for the loyalty program and there's no dispute

13  that they are not bound to arbitration, but yet The Container

14  Store has refused to produce any discovery, refused to move

15  this case forward, and is now arguing that this case should be

16  stayed while these few people go to arbitrate, which makes no

17  sense because the case is ripe and has always been ripe, and we

18  could proceed on virtually every issue with the three clients

19  that we have in the case.

20         So I think this whole distraction has really created

21  an inability for us to move forward.  The case should not be

22  stayed and I think this motion should be denied.

23         THE COURT:  So I just had kind of a sideline question

24  for you.

25         Your brief cites to the original complaint and not the

1    amended complaint, and also you just mention Massachusetts,

2    New York and Texas law, but the complaint refers to California

3    law as well.  So do you want to just clarify that.

4              MS. EISINGER:  Yes.  There is a California subclass

5    and I wasn't aware that our brief had made reference to the

6    complaint and not the amended.  So I apologize for that.

7              THE COURT:  Okay.  So you mean to refer to the amended

8    complaint and also include California law claims?

9              MS. EISINGER:  Yes.

10             THE COURT:  Okay.  And do you agree that Texas law

11   applies?

12             MS. EISINGER:  No, because no arbitration agreement

13   was formed, and so obviously Texas law would have no

14   applicability.  And we've cited to Massachusetts and

15   First Circuit authority and I think it's interesting that

16   The Container Store, you know, relies on at one point the

17   Supreme Court of Alabama, cases that have really no relevance

18   here.  We think Massachusetts and First Circuit authorities is

19   the appropriate binding authority on this issue.

20             THE COURT:  Okay.  So anything else from the

21   plaintiffs?

22             MR. WELTMAN:  Your Honor, I just want to dovetail one

23   issue, which is, you know, you specifically asked if there was

24   any sort of affirmative representation in the defendant's

25   papers that these terms and conditions were actually relayed to

1    the plaintiffs at the time of transaction, and my brother

2    indicated, referenced the Declaration of Ms. Manson, which is

3    Document 42-1, and I just reviewed it while we were discussing

4    it and wanted to point out again that there is actually no

5    affirmative link.  What it says is that as a condition of

6    enrollment, the plaintiff had to affirmatively agree to the

7    terms and conditions of the program because a check box had to

8    be clicked.  So the cashier was available to click the check

9    box and relay the information, but they don't say that the

10   cashier actually did that.

11          And so for all we know something came up on the screen

12   that was completely inaccessible to our clients.  The cashier,

13   with a line extending down the aisle, says do you want to

14   enroll in this program and my client says yes, and the person

15   reaches over and presses something and moves through the

16   screen.  You know, we have three briefs from The Container

17   Store on this issue.  We've got multiple exhibits and

18   declarations.  Not a single piece of evidence that actually

19   shows that my clients received any sort of notification that

20   this arbitration provision existed.

21          THE COURT:  Okay.  I think what I'd like to do is just

22   take a short break, and when I come back I'll hear the parties.

23   And I know we have -- we're late and people have been going on

24   and off the telephones for a long time, so I don't want to keep

25   you waiting longer than is necessary.  But I'm just going to

1    take a three- or four-minute break and I'll come back and hear

2    anyone who wants to be heard on any other issues, and I may

3    have a couple of additional questions.

4         Okay.  Thank you.

5         MR. WELTMAN:  Thank you, your Honor.

6         MS. EISINGER:  Thank you.

7         (There was a break in the audio.)

8         THE COURT:  So I do have a question.  I'm a little

9    confused about the NFB's role.

10        Is the NFB liable to go to arbitration or not, because

11   I don't know if any of the people the NFB represents are among

12   those who the defendants claim have to go to arbitration?

13        What's the NFB's role here?

14        MS. EISINGER:  NFB is acting on its own behalf, your

15   Honor, as a nonprofit seeking injunctive relief and declaratory

16   relief on behalf of itself and its members, and there's no --

17   because the NFB doesn't shop at The Container Store as an

18   organization, there's no argument, nor could there ever be any

19   argument, that they would have to arbitrate.  But they are just

20   seeking relief on behalf of themselves, injunctive and

21   declaratory relief.

22        So they're excluded from -- they're not seeking

23   monetary damages.  They're excluded from the arbitration issue

24   and their claims would continue, I think, whatever happens to

25   the individuals.

1          THE COURT:  And do defendants agree with that?

2          MR. CHILLEEN:  No.  The National Federation of the

3    Blind can only act through its members.  It's acting on behalf

4    of all its members.  So if some of their claims are subject to

5    arbitration, of course the National Federation of the Blind is

6    also subject to arbitration.

7          They only have standing, if at all, in this case by

8    virtue of their members.  They can't just pick and choose when

9    to -- you know, when they're bound by their members.  So they

10   are subject to arbitration.

11         THE COURT:  Okay.  Well, I'll have to think about that

12   myself.

13         And what is this cite of the Gorton case that you were

14   mentioning?  I don't know that I have that case.

15         MS. EISINGER:  *Schachter versus Circuit City Stores*.

16   It's in our brief, but it's *433 F.Supp.2nd 140*.

17         THE COURT:  Okay.

18         MS. EISINGER:  And one point on the NFB question.

19   They haven't moved to dismiss or otherwise made any motion with

20   respect to NFB's standing, so I didn't think this was before us

21   since they haven't moved to compel or moved to dismiss.  But of

22   course if the Court wishes to address that, you can ask us to

23   put in supplemental papers if you think that would be helpful

24   if you want to reach that question of NFB's (inaudible).

25         THE COURT:  I don't think we need to do that right

1   now, but it's good for me just to understand what the parties'

2   positions are on that.

3           MS. EISINGER:  Okay.

4           THE COURT:  Okay.  So --

5           MS. EISINGER:  Actually, I wanted -- I'm sorry, I just

6   wanted to respond to something else they had -- that

7   Mr. Chilleen had said about NFB.

8           THE COURT:  Sure.

9           MS. EISINGER:  That NFB is funding the litigation.

10  That was not based on any facts and is not the case.  So I just

11  wanted to point that out.  It's not relevant here, but it's

12  incorrect and shouldn't have been -- he shouldn't be making

13  those assertions.

14          THE COURT:  Okay.  So does anyone want to say anything

15  else about this motion to compel arbitration?

16          MR. CHILLEEN:  I just had a few words, your Honor.

17          THE COURT:  Sure.

18          MR. CHILLEEN:  Mike Chilleen on behalf of the

19  defendant.

20          Just that I think it's clear that the issue where the

21  plaintiffs agree does have to go to the arbitrator.

22  Plaintiffs' challenge is going to the entire contract, not just

23  the arbitration provision.  They're claiming they did not read,

24  could not read, had no chance to read, the entire agreement,

25  not just the arbitration provision.  We cite several cases in

1    our brief where people were illiterate or could not read and

2    the court held that the arbitrator had to decide those first.

3    The plaintiffs do not cite any cases having to deal with

4    someone who is illiterate or blind in their brief.

5          Second, you know, no one is tricking anyone.  There's

6    a lot of talk of the cashier trying to trick someone.

7    Obviously, that's not the case.  The plaintiffs knew that they

8    were enrolling in the program.  If you had looked at the

9    declaration, it says that they had to affirmatively agree.

10   Affirmatively agree means affirmatively agree.  They were aware

11   of the terms, that they were agreeing to terms, and under the

12   caselaw they had a duty to have it read to them.

13         Also, there's also constructive notice.  There's no

14   dispute that they received e-mails with links to the terms and

15   conditions.  There's no dispute that they continue to use the

16   benefits of the program.  There's no dispute they could have

17   canceled, but could not.  I mean, there's not even a single

18   declaration from the plaintiffs, probably because they didn't

19   want to go into those issues.

20         THE COURT:  Well, do you --

21         MR. CHILLEEN:  Instead they relied on these vague

22   discovery responses.

23         THE COURT:  Do you know that sending an e-mail to a

24   blind person is an effective way to communicate those --

25         MR. CHILLEEN:  Sure.  They have screen reader

1    software.  That's what it's for.  It translates into audio all

2    text.  I don't know of any blind people that use the internet

3    that don't have the screen reading software.

4         THE COURT:  Okay.

5         MR. CHILLEEN:  And --

6         MS. EISINGER:  I have -- I'm sorry, go ahead, Michael.

7         MR. CHILLEEN:  Oh, no.

8         And just finally, I do believe that, you know, to the

9    extent the plaintiff, was it Linebacker?

10        Yeah, Lineback.  She obviously enrolled online, so I

11   don't see how she blames the defendant for any lack of notice.

12        THE COURT:  Okay.  So I'm going to take this under

13   advisement.  I'm not going to rule right this minute, but I do

14   hope to decide this motion and issue something within the next

15   several business days.

16        So one thing I would like to do is in the event that I

17   deny the motion to compel arbitration, I'm sure the defendants

18   will want to appeal that, but I also know that the District

19   Court is very interested in getting discovery going on the

20   case, and I do think that the parties need to begin talking

21   about discovery in the event that the District Court also does

22   not send the case to arbitration.  The case is getting quite

23   old.  So I know that Judge Gorton said that written discovery

24   must be served on or before 120 days after the Court's rulings

25   on the motion, and my understanding is that would be the

1    District Court's ruling.

2              So I would like the parties to be ready to confer on

3    the discovery issues and to get discovery going.  I was not --

4    I don't know what to say.  I don't want to be disparaging, but

5    I don't see that this case poses unusual or intractable

6    problems with discovery.  Discovery should proceed as it does

7    in other cases.  And the plaintiffs are right, that boilerplate

8    objections to discovery requests are not suitable, and I would

9    hope that the parties would be able to discuss discovery issues

10   and move through them themselves.  But if you can't and you

11   must file more motions, I would just urge you to contact Kelly

12   Ann Moore, tell her that you're having a dispute, and I will

13   have a phone conference the next day, if possible.  You can

14   file letters or memos on the docket stating what the problems

15   are, but once this issue about arbitration is finally decided,

16   I really expect the parties, if you're not going to

17   arbitration, to move quickly with the discovery and get it

18   done.

19             So I'll do whatever I can.  I'm not going to revisit

20   the motion to compel discovery because I think both sides can

21   read the other's submissions and confer on, you know, what

22   discovery should be exchanged.  It doesn't seem like there

23   should be intractable problems with the discovery here.

24             So are there any particular discovery issues you'd

25   like to bring up now or do you want to wait until this, the

1    arbitration issue, plays out, and then get back to the Court?

2         Yes?

3         MR. CHILLEEN:  Mike Chilleen.

4         Just to clarify, so to the extent the Court does not

5    compel arbitration, and it doesn't seem like there's going to

6    be a ruling on this particular motion to compel discovery, is

7    it basically the Court just ordering the parties to meet and

8    confer since they never met and conferred on the current

9    motion --

10        THE COURT:  Yes.

11        MR. CHILLEEN:  -- on those requests, and then to the

12   extent we have a problem, then we would, you know, refile a

13   motion and contact Kelly Ann and all that?

14        THE COURT:  Yes.  And I think what we'll do is I won't

15   rule on the motion to compel discovery at this time.  I'll let

16   the parties confer and -- I mean, this is all assuming the case

17   does not go to arbitration.  I'll just allow the parties to

18   confer and try to work things out.  They can report back to the

19   Court, are you still having issues, are they the same issues or

20   different ones, and what can we do to help you, and then I'll

21   finally make a ruling on that previous motion that was filed.

22   But I read the motion carefully and it does seem to me like

23   these are issues that the parties really should be able to work

24   out, and I think especially if you confer in good faith and

25   kind of go over the issues.

1          You know, for example, if the discovery requested is

2     just really voluminous and the defendants think it's too much,

3     I'm sure the plaintiffs would talk to you about narrowing it

4     down somewhat.  On the other hand, you do need to produce the

5     deponent that they want, and I'm sure the parties can reach

6     some mutually agreeable time to depose such a person.

7          So anyway, I really want to help you.  Assuming the

8     case does not go to arbitration, I want to help you resolve

9     your issues and just move the case forward.  And I think you're

10    also scheduled for mediation in June, so it might be helpful to

11    exchange at least some discovery before that time so that when

12    you go to mediation, if you're still ready to go then, you'll

13    have a better sense of the case.

14          Right?

15          MS. EISINGER:  Thank you, your Honor.

16          I want to let you know that the defendant did serve

17    discovery on us the last day of the discovery deadline and we

18    plan to respond within the 30 days, and we will take your

19    advisement and reach out to them and see if we can make

20    progress on the affirmative discovery that we've been -- that

21    we've submitted to them originally at the beginning of the

22    case.

23          THE COURT:  Okay.  And that's --

24          MS. EISINGER:  Can I make one final point on --

25          THE COURT:  All of that is just depending on how

1    this -- the motion to compel arbitration plays out.  I just

2    don't want to trouble everybody with dragging you -- if it

3    turns out you're not going to arbitration, I didn't want to

4    trouble everyone, dragging them back in here to deal with that

5    at that time.  So, okay.

6            Yes, anything else?

7            MR. CHILLEEN:  No, your Honor.

8            MS. EISINGER:  I had just one point on the arbitration

9    that I wanted to make before we leave that topic.

10           THE COURT:  Sure.

11           MS. EISINGER:  I think that even if The Container

12   Store came back with some declaration or some statement that

13   they generally tell their customers that they're agreeing to

14   terms and conditions, again I don't think that that's

15   sufficient notice to say that you're waiving your right to

16   bring a lawsuit to represent their claims and agreeing to

17   arbitrate in Texas, because most folks, blind or not blind,

18   expect that terms and conditions would contain most of what's

19   in the terms and conditions about the discounts, about the

20   program, but not these kinds of waivers.  So I think the courts

21   are clear that you have to have some kind of explicit reference

22   when there's important terms like this, even in an employment

23   context.

24           And again, subsequent e-mails, when they never had

25   notice in the beginning, that don't say, you know, here are

1    important legal conditions all in bold or in some way screaming

2    out at customers so they know what they're supposed to be on

3    notice of, I think anything short of that, which is what The

4    Container Store is doing, isn't sufficient.

5            So that's my only other point on the arbitration.

6            THE COURT:  Okay.  Well, thank you all very much.

7            MR. WELTMAN:  Thank you, your Honor.

8            MR. CHILLEEN:  Thank you.

9            MS. EISINGER:  Thank you, your Honor.  Thank you,

10   everyone.

11

12            (The hearing was concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

        I, Karen M. Aveyard, Approved Federal Court
Transcriber, do hereby certify that the foregoing transcript,
consisting of 32 pages, is a correct transcript prepared to the
best of my skill, knowledge and ability from the official
digital sound recording of the proceedings in the
above-entitled matter.

/s/ Karen M. Aveyard

Karen M. Aveyard

March 19, 2016

Date